IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

RICHARD A. NICOLAS,

    Petitioner,

    v.                                                    Civil Action No. RDB-06-2637

THE ATTORNEY GENERAL OF
THE STATE OF MARYLAND, *et al.*,

    Respondents.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM OPINION

Petitioner Richard A. Nicolas, by counsel, has petitioned pursuant to 28 U.S.C. § 2254 for habeas corpus relief and challenges his 1997 conviction after a jury trial in the Circuit Court for Baltimore City for the first-degree murder of his two-year old daughter and a related handgun offense. On the evening of Friday, July 26, 1996, Richard Nicolas, an emergency medical technician ("EMT"), was in his car in Baltimore City with his two-year old daughter Aja. The evening ended in tragedy as Aja was killed by a gunshot wound to the head. It is undisputed in this case that Nicolas ran to a nearby Texaco gasoline station to call 911, as this was before cell phones were prevalent. By the time paramedics and police officers arrived at the scene, Aja was dead.

Nicolas was taken to the police station where he cooperated by consenting to questioning and to a search of his apartment. He told police authorities that he had taken Aja to see the movie "Pinocchio." Mr. Nicolas stated that while he was driving Aja home after the movie another driver bumped his car. After pulling over to the left side of a side street, the other vehicle pulled up along the passenger side of Nicolas' car and a heated argument

ensued. Nicolas contended that as he exited and came around the back of his car, he heard a gunshot and the other car sped away. Despite his description of the events, Nicolas was ultimately charged with Aja's murder.

At his trial in the Circuit Court for Baltimore City which began on June 6, 1997, the State's theory was that Nicolas shot Aja in the car before the movie and then fabricated a story about road rage gone wrong.[1] This theory relied on the testimony of Dr. Dennis Chute, the State medical examiner who performed the autopsy on Aja; Dr. Chute suggested that the lividity pattern[2] on Aja's body showed that she had been dead for at least two hours before Nicolas called 911. Thus, the state reasoned Nicolas shot Aja around 7:45 p.m., giving him sufficient time to see the movie to create an alibi and dispose of the gun. Nicolas, however, testified that Aja was shot around 9:45 p.m. that evening. Nicolas was ultimately convicted of first-degree murder, and he was sentenced to life without parole, plus 20 years.

Sometime in 2008 or 2009, counsel representing Nicolas in his federal habeas corpus proceedings obtained documents under the Maryland Public Information Act, Maryland Code, General Provisions Art. §§ 4–101 to 4–601,[3] identifying two previously undisclosed witnesses, Jennifer McKinsey and Richard Benson. Both were guests at a Holiday Inn near

---

[1]   The State's theory implied a motive that Nicolas did not want to support Aja and was the beneficiary of a children's life insurance policy. Nicolas, however, testified that he called Aja every day from the time she was one year old because she lived with her mother and it was important for him that she realize she had a good father in her life. Witnesses testified at trial that Nicolas was a devoted and loving father.

[2]   Lividity or *livor mortis* results after blood in the body stops flowing and starts to settle to the lowest parts of the body, causing discoloration.

[3] The Maryland Public Information Act was previously codified at Md. Code, State Gov't Art. §§ 10-601 to 10-628. The current version, now part of the new "General Provisions" Article, became effective October 1, 2014. *See Waterkeeper Alliance, Inc. v. Maryland Dep't of Agriculture*, 439 Md. 262, 267 n.1 (2014).

where Aja was shot on July 26, 1996. When police interviewed Jennifer McKinsey on the day after the shooting, McKinsey said that she heard a loud popping sound like a gun shot around 9:45 p.m.. Similarly, Richard Benson told police that he heard a loud sound like a car backfiring or exploding while in the hotel parking lot on July 26, 1996, at about 10:00 p.m.. This timeline paralleled the time Nicolas testified his daughter was shot by someone in a second car. The Benson and McKinsey witness statements were not provided to defense counsel, and would have provided key and material information for his defense.

Petitioner's case, initiated nearly a decade ago, now comes before this Court for a third time, having been stayed on two prior occasions in order for Petitioner to return to the state courts for the purpose of exhausting all of his various claims. In his Amendment to, and Second Supplemental Memorandum of Law in Support of, Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (ECF No. 145), Petitioner presently advances the following four habeas claims: (1) his trial counsel provided ineffective assistance by failing to become sufficiently educated about lividity evidence and by failing to rebut the state's expert at trial; (2) his trial counsel provided ineffective assistance by requesting or failing to object to the court's dual inference instruction; (3) gunshot residue ("GSR") evidence admitted at trial is now recognized as unreliable; and (4) he was convicted in violation of his due process rights because favorable and material evidence, specifically the witness statements of Richard Benson and Jennifer McKinsey, were withheld in violation of *Brady v. Maryland*, 373 U.S. 83 (1963) in which the Supreme Court held that supression by the prosecution of evidence favorable to an accused violates due process of law.

The parties' submissions have been reviewed and this Court held a hearing on

February 24, 2015.  For the reasons that follow, Petitioner Richard A. Nicolas's Petition for

Writ of Habeas Corpus (ECF No. 1) along with his Amendment to, and Second

Supplemental Memorandum of Law in Support of, Petition for Writ of Habeas Corpus

pursuant to 28 U.S.C. § 2254 is GRANTED IN PART AND DENIED IN PART.

Specifically, the Petition is granted with respect to Petitioner's *Brady* claim, and it is denied

with respect to all other claims.   The failure of the State to provide the Benson and

McKinsey witness statements to defense counsel prior to trial violated due process of law

and calls into question the result of that trial, undermines confidence in its outcome, and did

not result in a jury verdict worthy of confidence.   Accordingly, Petitioner's conviction and

sentence are VACATED, and the case is remanded to the Circuit Court for Baltimore City

for a new trial.

## **BACKGROUND**

In 1997, Nicolas was convicted of first degree murder and use of a handgun in the

commission of a crime of violence in connection with the death of his two-year old daughter

Aja.  The State's theory of the case was that Nicolas had killed his daughter in order to cash

in on a life insurance policy and then attended a movie in order to create an alibi.  Nicolas

contended, however, that an unknown driver had bumped his car on the way home from the

movie theater and that, after he pulled over and engaged in a heated altercation, the driver

shot his daughter and drove off.   At trial, an important piece of the State's evidence was the

expert testimony of Dr. Dennis Chute, the Medical Examiner, who testified that the lividity

(or pooling of blood) in Aja's left side and back indicated a time of death two hours earlier

than Petitioner claimed.   The State also relied upon evidence of gunshot residue on

Petitioner's hands and various inconsistencies in Petitioner's story.

The Court of Special Appeals of Maryland affirmed Mr. Nicolas's convictions in an unreported opinion, *Richard Nicolas v. State*, No. 1485, Sept. Term, 1997 (filed December 21, 1998), and the Court of Appeals of Maryland denied a Petition for Writ of Certiorari on April 16, 1999. Mr. Nicolas filed *pro se* a Petition for Post-Conviction Relief on July 1, 1999, in the Circuit Court for Baltimore City, which was later supplemented with the help of the public defender's office. Following a hearing held on July 22, 2005, the Circuit Court for Baltimore City denied post-conviction relief on October 20, 2005. Mr. Nicolas's Application for Leave to Appeal was summarily denied by the Maryland Court of Special Appeals on November 30, 2005.

Mr. Nicolas, acting *pro se*, then filed a Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 in this Court on October 10, 2006, raising multiple claims.[4] A review of the case by assigned counsel revealed additional issues that counsel believed could warrant post-conviction relief. Accordingly, Nicolas filed a motion to stay the proceedings in this Court so that these new claims could be exhausted in state court. On February 9, 2010, this Court granted Mr. Nicolas's motion to stay the proceedings. On March 12, 2010, Mr. Nicolas, through counsel, filed a Motion to Reopen Post-Conviction Case in the Circuit Court for Baltimore City, raising additional claims and facts that had not been presented in

---

[4] The original named Respondents were the Attorney General of the State of Maryland and James Smith, the Warden of the Jessup Correctional Institution. Petitioner is currently imprisoned at the Western Correctional Institution, where Richard J. Graham, Jr. is the current warden. Accordingly, this Court will direct the Clerk to add Richard J. Graham, Jr. as a Respondent in his official capacity and to remove the other named Respondents (Bobby Shearin and Frank Bishop). *See* Fed. R. Civ. Pro. 25 ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party. . . . The court may order substitution at any time, but the absence of such an order does not affect the substitution.").

his initial post-conviction petition. In a written memorandum issued without a hearing, the Circuit Court for Baltimore City, Judge Stuart R. Berger presiding, denied Mr. Nicolas's Motion to Reopen Post-Conviction Case. On July 15, 2011, the Court of Special Appeals summarily denied Mr. Nicolas's Application for Leave to Appeal the denial of his Motion to Reopen Post-Conviction Case.

Mr. Nicolas then returned to this Court.   Nicolas was granted discovery and thereafter submitted his First Supplemental Memorandum of Law in this Court. (ECF No. 116). In its Second Limited Answer to Petition for Writ of Habeas Corpus (ECR No. 117), the State argued that the use of new materials uncovered by this Court's *in camera* review of the State's files altered some of Mr. Nicolas's underlying habeas claims to the point where they were now unexhausted; the State suggested that the Maryland state courts should have an opportunity to evaluate his claims in light of the new evidence. After a hearing on the question of exhaustion, this Court issued an Order and Memorandum opinion on September 24, 2012 staying and holding the case in abeyance to permit Mr. Nicolas to exhaust his Brady and lividity (ineffective assistance of counsel) claims in State court, and granting Mr. Nicolas leave to amend his Petition for Writ of Habeas Corpus to include his gunshot residue ("GSR") claim. (ECF Nos. 126 & 127)

Thus, on November 14, 2012, Mr. Nicolas filed a second Motion to Reopen Post Conviction Proceeding in the Circuit Court for Baltimore City. A hearing was held on March 7, 2013.  The Circuit Court denied Mr. Nicolas's Motion to Reopen on April 2, 2013, and the Maryland Court of Special Appeals denied Mr. Nicolas' application for leave to appeal a year later on April 2, 2014.  Mr. Nicolas then timely petitioned for a writ of certiorari in the

Court of Appeals of Maryland, which the Court of Appeals denied on July 21, 2014.

Mr. Nicolas presently advances the following four habeas claims: (1) his trial counsel provided ineffective assistance by failing to become sufficiently educated about lividity evidence and by failing to rebut the state's expert at trial; (2) his trial counsel provided ineffective assistance by requesting or failing to object to the court's dual inference instruction; (3) gunshot residue ("GSR") evidence admitted at trial is now recognized as unreliable; and (4) he was convicted in violation of his due process rights because favorable and material evidence, specifically the witness statements of Richard Benson and Jennifer McKinsey, were withheld in violation of *Brady v. Maryland*.  Nicolas contends that he has now fully exhausted all of his habeas claims in State court, so they are now ripe for review in this Court.

## STANDARD OF REVIEW

An application for writ of habeas corpus may be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  The federal habeas statute at 28 U.S.C. § 2254 sets forth a "highly deferential standard for evaluating state-court rulings." *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997); *see also Bell v. Cone*, 543 U.S. 447 (2005).  This standard is "difficult to meet," and requires federal courts to give state-court decisions the benefit of the doubt.  *Cullen v. Pinholster*, __U.S. __, __, 131 S. Ct. 1388, 1398 (2011) (internal quotation marks and citations omitted); *see also White v Woodall,* 2014 WL 1612424, * 4 (April 23, 2014, U.S.__, 134 S. Ct 1697, quoting *Harrington v. Richter*, __U.S. __, __, 131 S. Ct. 770, 786-87 (2011) (state prisoner must show state court ruling on claim presented in federal court was "so lacking in justification that there was an error well understood and

comprehended in existing law beyond any possibility for fairminded disagreement.").

A federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits: 1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States"; or 2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254 (d).  A state adjudication is contrary to clearly established federal law under § 2254(d)(1) where the state court 1) "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or 2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

Under the "unreasonable application" analysis under § 2254(d)(1),  a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 131 S. Ct. at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  Thus, "an unreasonable application of federal law is different from an incorrect application of federal law." *Id.* at 785 (internal quotation marks omitted).

Further under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301, 130 S. Ct. 841, 849  (2010). "[E]ven if reasonable minds reviewing the record might disagree about the finding in question," a federal habeas court may not conclude that the state court decision was based on an

unreasonable determination of the facts. *Id.* "[A] a federal habeas court may not issue the writ simply because [it] concludes in its independent judgment that the relevant state-court decision applied established federal law erroneously or incorrectly." *Renico v. Lett,* 559 U.S 766, 773, 130 S. Ct. 1855, 1862 (2010).

The habeas statute provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "Where the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part." *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010). This is especially true where state courts have "resolved issues like witness credibility, which are 'factual determinations' for purposes of Section 2254(e)(1)." *Id.* at 379.

## DISCUSSION

Mr. Nicolas presently advances the following four habeas claims: (1) his trial counsel provided ineffective assistance by failing to become sufficiently educated about lividity evidence and by failing to rebut the state's expert at trial; (2) his trial counsel provided ineffective assistance by requesting or failing to object to the court's dual inference instruction; (3) gunshot residue ("GSR") evidence admitted at trial is now recognized as unreliable; and (4) he was convicted in violation of his due process rights because favorable and material evidence, specifically the witness statements of Richard Benson and Jennifer McKinsey, were withheld in violation of *Brady v. Maryland.*

a) Ineffective Assistance of Counsel - Lividity

Petitioner argues that the state courts unreasonably concluded that his counsel was

not ineffective for failing either to become educated about lividity or to call a rebuttal

witness.[5]  To state a Sixth Amendment claim of ineffective assistance of counsel, a petitioner

---

[5]   The state court first addressed this issue on Petitioner's original Motion for Post-Conviction
Relief.  Ruling from the bench, Judge Allison found:

> The third allegation of error also goes to the ineffectiveness of assistance of
> counsel based on counsel's alleged failure to engage an expert to rebut the State's
> testimony from Dr. Shutt [sic] with respect to lividity, and in particular, the time
> affixing of lividity, which he, Dr. Shutt, testified was around two hours.
>
> The petitioner, in this petition and at the time of the evidentiary hearing,
> contends that that testimony was wrong, that lividity set in at four to six hours,
> which would have set the time of lividity much earlier.  As a preliminary matter, this
> Court does not find as a factual matter that Dr. Shutt was incorrect.  But even if he
> was, it is of no moment, of no relevance in this case, because establishing lividity
> earlier would not have helped the petitioner at trial.
>
> The theory of the petitioner's case was that it was a drive-by shooting of his
> daughter after the theater and obviously before he called 911.  There was an
> approximately 12-minute time period there, so establishing lividity at a far earlier
> time rather than the two-hour time was totally inconsistent with his theory of
> defense, his theory of the case.  There was no reason for his trial counsel to attempt
> to establish lividity at four to six hours rather than approximately two hours, because
> it did not fit in any way with his theory of the defense.  In fact, it would have
> accentuated the inconsistency in his defense.
>
> For this reason, the Court is denying the petition based on the allegation of
> ineffectiveness of counsel regarding the failure to obtain an expert to rebut Dr.
> Shutt.

Oct. 20, 2005 Hr'g Tr. at 2-4.  Subsequently, Petitioner raised the issue again on his Motion to
Reopen Post-Conviction Case.  In denying that motion, Judge Berger ruled:

> Petitioner alleges his trial and post conviction counsel were ineffective in
> addressing the medical forensic evidence presented by the State.  At trial, the
> Petitioner presented an alternative theory for of [sic] how the death of his daughter
> occurred. According to the Petitioner, a white man drove up next to his vehicle and
> started an argument in which racial epithets were exchanged.  The other man fired a
> gun into Petitioner's truck, and a bullet struck his daughter, killing her at
> approximately 9:45 pm.  The Petitioner claimed to have immediately left the vehicle
> and run to a nearby gas station to call the police.  However, the State presented
> evidence at trial through the testimony of Dr. Dennis Chute, the State's assistant
> Medical Examiner, that the victim had been shot well before 9:45 pm, and had in
> fact been laying on her side for possibly two hours before the police were called.
> The State also presented evidence through expert Daniel Van Gelder that the
> Petitioner had gunshot residue (GSR) on his hand on the night of the murder,
> consistent with having recently fired a gun.
>
> The Petitioner asserts that trial counsel were ineffective for failing to object
> to the lividity testimony of Dr. Chute on the basis that the State never provided the

defense with Dr. Chute's time of death estimate, and for failing to request a recess in order to retain their own forensic pathologist to challenge Dr. Chute's theory. The Petitioner also asserts that post conviction counsel was ineffective in his handling of forensic testimony at the post conviction hearing. At the post conviction hearing, in an attempt to attack the State's theory of the time of death, defense expert Dr. Isador Mihalakis testified as to the time of when lividity might become fixed. The Petitioner now contends that this further muddled the issue rather than clarifying it. It is now the Petitioner's position that post conviction counsel should have elicited testimony from Dr. Mihalakis regarding the inappropriateness of using lividity to determine time of death at all.

     . . .

       This Court rejects the Petitioner's contentions. Inasmuch as the autopsy report stated that lividity was fixed, the Petitioner had sufficient information to know that time of death would be at issue. Indeed, the Petitioner's counsel cross-examined Dr. Chute on the lividty issue at trial. According to the State, the Petitioner's counsel consulted with a pathologist but decided not to call him as a witness. Furthermore, the post conviction counsel's attempt to attack the State's theory of the time of death can hardly be deemed ineffective assistance of counsel.

       These decisions of experienced defense counsel clearly fall within the ambit of trial strategy that reviewing courts are not inclined to second-guess.

Aug. 18, 2010 Mem. Op. (Berger, J.) at 5-7. The issue was raised for a final time in Petitioner's second Motion to Reopen Post-Conviction Proceedings, and Judge Geller ruled accordingly:

       2.    <u>Trial Counsel</u>

       The lividity testimony given by the State's expert witness, Dr. Dennis Chute, during Petitioner's trial advanced the State's theory that the victim died two hours before Petitioner claimed her death occurred. Petitioner argues that his trial counsel was ineffective by failing to challenge this testimony. Although this issue was considered by The Honorable Stuart R. Berger on Petitioner's first Motion to Reopen, Petitioner claims that a letter procured through an *in camera* review constitutes new evidence that the lividity testimony was not credible and should have been refuted.

       First, Petitioner claims his trial counsel was ineffective by failing to object to Dr. Chute's testimony based on a discovery violation. Although the State argues this claim is waived because it was not raised during the original post-conviction, this Court notes that Judge Berger addressed this issue on the first Motion to Reopen. This Court concurs with Judge Berger's analysis and adopts it herein.

       Petitioner argues that while the prosecution did provide defense counsel with the autopsy report that mentioned lividity, prosecutors did not inform the defense that it planned to use this information to establish time of death. Judge Berger concluded, "Inasmuch as the autopsy report stated that lividity was fixed, the Petitioner had sufficient information to know that time of death would be at issue." August 18, 2010 Memorandum Opinion at 7. Judge Berger's analysis is equally valid today. Defense counsel was not ineffective for failing to object because a reasonable attorney may have decided that since he had access to the autopsy report, there was no basis for a discovery objection. Because counsel acted in an objectively reasonable fashion, there is no need to consider prejudice.

11

Next, Petitioner claims trial counsel was ineffective for failing to effectively cross-examine Dr. Chute or call a rebuttal expert. Failure to call a rebuttal expert when the prosecution presents a witness who directly contradicts the defense theory may be grounds for an ineffective assistance claim. See *Duncaon v. Ornoski*, 528 F.3d 1222, 1235 (9th Cir. 2008). While Judge Berger already examined and rejected these claims, new evidence related to this matter was discovered during the federal in camera review. At issue are letters written by the prosecution to team to Dr. Chute, the lividity expert, and to Officer Hannah, the police officer at the scene of the crime. The Dr. Chute letter stated that lividity was "the whole case" and that the prosecutors were "100%" certain that his testimony won the case. (Motion to Reopen at Ex. 18(LL)). The letter to Officer Hannah stated, "It is only because you did move [Aja's body] that the Medical Examiner saw the fixed lividity on her left side and her back when the autopsy was done. This fact was the whole case." (Motion to Reopen at Ex. 1 8(KK)). The prosecution further states, "We learned from an unimpeachable source that the defense did not spot the significance of Dr. Chute's findings before we raised the issue in open court." (Id.).

While the letters evidence an unnecessary and distasteful display of glee, this unfortunate conduct does not make transform [sic] the objectively reasonable performance of trial counsel into ineffective assistance of counsel. Even if the prosecution is correct that defense counsel was unprepared for Dr. Chute's analysis of the lividity, it does not follow that the subsequent actions they took were objectively unreasonable. Trial transcripts reveal that counsel obtained admissions from Dr. Chute that he could not tell if lividity fixed first on Aja's left side or on her back, that other factors could affect lividity, and that Aja's body could have been placed on her side after being removed by the Office of the Medical Examiner. Jr. June, 17, 1997, at 185, 191, 201). The State also notes that trial counsel consulted its own forensic pathologist and chose not to call him to testify. Counsel is not ineffective every time it is surprised by the opposing counsel's line of questioning. It is reasonable for an attorney who is surprised by testimony to conduct a cross-examination that produces admissions, to consult with another expert, and to use independent legal judgment as to whether the consulting expert should be called to testify.

Petitioner also argues that a letter from Dr. Chute obtained by Petitioner's counsel while pursuing the first Motion to Reopen demonstrates that counsel was ineffective. This letter, which states that lividity alone should not be used to determine time of death, is also insufficient to establish an ineffective assistance claim. Dr. Chute asserts that other evidence, like when the victim was last seen, rigor and calor mortis, environmental conditions, and other factors should also be considered. (Motion to Reopen at Ex. 14(G)). In Petitioner's trial, defense counsel presented evidence that the victim was alive after 7:00 pm when her picture was taken at a photo booth, and presented evidence on calor mortis (body temperature). Even if Dr. Chute did not specifically testify to these factors, there were facts other than the lividity testimony that the jury could consider to determine what time Aja died. Considering all arguments and evidence known at the time of trial and discovered at various points thereafter, this Court concludes that defense counsel acted in an objectively reasonable manner and that Petitioner has not established an ineffective assistance of trial counsel claim.

must satisfy the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 671 (1984). *See Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000). The first, or "performance" prong, of the test requires a showing that defense counsel's representation was deficient and fell below an "objective standard of reasonableness." *Strickland*, 466 U.S. at 688. There is a strong presumption that counsel's actions fell within the "wide range of reasonable professional assistance." *Id.* at 688-89. The second, or "prejudice" prong, requires that defendant demonstrate that his counsel's errors deprived him of a fair trial—a trial whose result is reliable. *Id.* at 687.

"Surmounting *Strickland*'s high bar is never an easy task," as "the standard for judging counsel's representation is a most deferential one." *Harrington v. Richter*, 562 U.S. 86, 105 (2011). When the ineffective assistance issue arises in the context of a prisoner's challenge to a state court's application of *Strickland* under § 2254, the district court's review is even more deferential:

> The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness

---

3. Post-Conviction Counsel
    Petitioner argues that post-conviction counsel was ineffective for "muddying the waters" further with their expert testimony on lividity. Petitioner states that the testimony was overly confusing and that counsel never asked the crucial question of whether lividity is a reliable method to determine time of death.
    While new counsel retained by Petitioner for this stage of proceedings may disagree with the strategy employed, it cannot be said that post-conviction counsel acted in an objectively unreasonable manner. It is not for this Court to second-guess strategic decisions by postconviction counsel. For a strategic reason based on conversations with the expert or other knowledge, counsel may have decided to focus on other aspects of the expert's report. Since counsel acted in an objectively reasonable fashion, there is no need to consider prejudice.
Mar. 29, 2013 Mem. Op. at 2-6 (Geller, J.)

> under *Strickland* with unreasonableness under § 2254(d). When §
> 2254(d) applies, the question is not whether counsel's actions
> were reasonable. The question is whether there is any
> reasonable argument that counsel satisfied *Strickland*'s
> deferential standard.

*Harrington*, 562 U.S. at 105 (internal quotation marks and citations omitted).

Keeping this "doubly" deferential standard in mind, the Court turns to the state courts' ruling that Petitioner's attorneys provided effective assistance with respect to the lividity issue.  Petitioner asserts that his trial attorneys provided deficient performance because they failed to call a rebuttal witness when Dr. Chute provided expert testimony that directly contradicted Petitioner's theory of the case.  Petitioner asserts that his trial counsel did not understand the import of Dr. Chute's testimony, and as a result, his attorneys only briefly cross-examined Dr. Chute because they were unprepared for his testimony.

Notably, the petitioner in *Harrington* made a similar argument, asserting that his attorney was caught off-guard by the prosecution's use of expert testimony and that his attorney should have consulted an expert in order to buttress his version of events.  In that case, the Supreme Court noted: "Rare are the situations in which the wide latitude counsel must have in making tactical decisions will be limited to any one technique or approach. It can be assumed that in some cases counsel would be deemed ineffective for failing to consult or rely on experts, but even that formulation is sufficiently general that state courts would have wide latitude in applying it."  *Harrington*, 562 U.S. at 106 (internal quotation marks and citations omitted); *see also Hudson v. Lafler*, Civ. No. 04-cv-74001-DT, 2006 WL 162541, at *4 (E.D. Mich. June 8, 2006) (denying ineffective assistance claim in § 2254

petition based upon counsel's alleged failure to adequately challenge prosecution's gunshot residue expert or to obtain an independent gunshot residue expert).

As in *Harrington*, the record in this case is sufficient to establish that the state court reasonably concluded that the performance of Petitioner's attorneys was not deficient with respect to the lividity issues.  Petitioner first raised this ineffective assistance issue in his original petition for post-conviction relief; specifically, Petitioner asserted that Dr. Chute was incorrect when he testified that lividity could become fixed within two hours, and he argued that his counsel should have realized that the proper time frame was closer to four to six hours.  Judge Allison reasonably rejected this argument, finding that it could not support a claim for ineffective assistance of counsel because an earlier time of death still contradicted Petitioner's theory of the case.

When Petitioner re-raised the lividity issue in his Motion to Reopen, Judge Berger noted that Petitioner's attorneys obtained several concessions from Dr. Chute on cross-examination and that one of Petitioner's attorneys had consulted a forensic pathologist before trial.  In light of these findings, it was not unreasonable for Judge Berger to come to the conclusion that Petitioner had failed to satisfy the first *Strickland* prong because his attorneys' actions comported with a reasonable trial strategy.  Instead of creating a battle of the experts, Petitioner's counsel cast doubt on Dr. Chute's testimony through cross-examination; indeed, counsels' decision to cast doubt is a trial strategy worthy of the usual deference.  *Cf. Harrington*, 562 U.S. at 109 ("[I]t sometimes is better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates.").  Finally, because Judge Geller rejected Petitioner's claims in Petitioner's second motion to reopen for the

15

same reasons as Judge Berger, this Court finds that Judge Geller's decision was reasonable as well.

Thus, after reviewing the state courts' opinions and the record in this case, it is clear that the state courts could have reasonably concluded that the performance of Petitioner's counsel was not deficient with respect to the handling of the lividity issues. Because Petitioner's claims arise under § 2254, this is all that is necessary to bar Petitioner's requested relief. *Cf. Harrington*, 562 U.S. at 105 ("When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.").

b) INEFFECTIVE ASSISTANCE OF COUNSEL – "DUAL INFERENCE" JURY INSTRUCTION

Petitioner argues that he received ineffective assistance of counsel because of his counsel's request for or failure to object to the "dual inference" instruction given by the trial court. The instruction given by the trial court read:

> [I]n the discussion or consideration of circumstantial evidence, when you discuss it in the jury room, if you find that the evidence is equally consistent with innocence, as well as guilt, then you must find the defendant innocent. He is entitled to an inference of innocence if there is an equal finding of that which could be guilt or that which could be innocence.

According to the Petitioner, the Court of Appeals of Maryland found that the use of a functionally identical instruction constituted reversible error in *Denson v. State*, 628 A.2d 182 (Md. 1993);[6] therefore, Petitioner contends that his counsel's failure to object to and/or acquiescence to the instruction given constitutes ineffective assistance of counsel.

---

[6]   In *Denson*, the Court of Appeals of Maryland found that the trial court had committed reversible error by instructing the jury accordingly:

Petitioner's claim relating to the dual inference instruction was originally addressed by

the state court upon his original Motion for Postconviction Relief.  Ruling from the bench,

the state postconviction court refused to find ineffective assistance.[7]

---

If the evidence presented to you is capable of two or more inferences of equal weight, one consistent with guilt and one consistent with innocence, you must give the defendant the benefit of the inference consistent with innocence.

628 A.2d at 184.  The court found that the instruction "amounted to a change in the State's burden of proof to a preponderance of the evidence."  *Id.*

[7]   The ruling on the dual inference instruction reads as follows:

The next allegation of error is also one for ineffective assistance of counsel for failing to object to the dual inference instruction given by the court.  In Denson versus State, 331 Md. 324 (1993), it does not forbid a dual inference instruction, rather it states when a trial court does instruct the jury on the proposition, meaning dual inference, it must accurately state it.  The court must be careful not to mislead or confuse the jury.  That's a [sic] page 330 to 331.

Petitioner's counsel asked – petitioner's trial counsel asked for a dual inference instruction in the context of the instruction on circumstantial evidence, and that is what they got.  There was an expanded instruction given on circumstantial evidence, and as part of that expanded instruction on circumstantial evidence, the dual inference instruction was given.

The issue is not whether the instruction would have been error if objected to by the defense, the question is whether the obviously strategic decision of the petitioner's counsel to seek this dual instruction in the context of a broader instruction on circumstantial evidence overcomes the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.

This was not an oversight by counsel. It was not a mistake or an error.  It was a reasoned request that petitioner's counsel had to fight for, had to fight to get the trial judge to give, or at least argue with the trial judge to get her to give this instruction.

And a reading of petitioner's counsel's closing argument reveals that it was used to his advantage. The entire thrust of the defense's closing argument was that the jury was being asked by the prosecution to speculate, and that the detective and investigators "eyeballed it."

The dual inference instruction as given, and in the context it was given; i.e., pertaining to the consideration of circumstantial evidence only and not the overall burden of persuasion, was a strategic decision of the petitioner's lawyers, and it was not unreasonable under the circumstances. For this reason, the petition based on the ineffectiveness of assistance of counsel for requesting the dual inference instruction is denied.

Resp't Ex.4 at 4-5.

This Court first notes that a state court's failure to adhere to state law, in and of itself, is insufficient to warrant habeas relief. *See Estelle v. McGuire*, 502 U.S. 62, 67 (1991) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.'" (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990))). In this case, however, Petitioner has identified a federal right—his Sixth Amendment right to effective legal counsel—and has identified at least one case in which the United States Court of Appeals for the Fifth Circuit found that a habeas petitioner was entitled to relief where his attorney fails to object to a jury instruction that had been previously rejected by a state's high court. *See Gray v. Lynn*, 6 F.3d 265, 269 (5th Cir. 1993) ("[T]he failure by Gray's counsel to object to the erroneous instruction [on the elements of an attempted murder charge] cannot be considered to be within the wide range of professionally competent assistance." (internal quotation marks omitted)).[8]

This Court assumes *arguendo* that the failure to object to a jury instruction based upon state law can constitute deficient performance for purposes of *Strickland* such that relief

---

[8]   The conclusion of the United States Court of Appeals for the Fifth Circuit in *Gray* is somewhat troubling in light of the United States Supreme Court's statement in *Estelle v. McGuire*, 502 U.S. 62, 72 (1991), that "[f]ederal habeas courts . . . do not grant relief, as might a state appellate court, simply because the instruction may have been deficient in comparison to the [California criminal pattern jury instructions] model." *Id. Gray* does not cite to *Estelle*. Thus, although a habeas petitioner is barred from habeas relief under *Estelle* where his attorney objected to an erroneous state law instruction and was overruled by the state court, *Gray* appears to permit a habeas petitioner to proceed where his attorney requested or failed to object to an erroneous jury instruction involving an issue of state law. Accordingly, under *Gray*, federal courts will routinely address the issue barred by *Estelle* as an embedded issue in the ineffective assistance analysis.

Regardless of the Fifth Circuit's determination of the issue, however, this Court notes that the attorneys' decisions in this case implicate a matter of constitutional import—the prosecution's obligation to present proof evidencing guilt beyond a reasonable doubt. *See In re Winship*, 397 U.S. 358, 364 (1970) ("[W]e explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.").

would be warranted under § 2254.[9]  Even with that assumption, however, this Court finds that the state court's denial of post-conviction relief in this case was ultimately not unreasonable. In order to prevail on his ineffective assistance of counsel claim, *Strickland* requires a showing of prejudice; and in order to succeed on his § 2254 habeas petition raising an ineffective assistance issue, Petitioner must demonstrate that the state courts came to an unreasonable conclusion on the prejudice issue.  *See Harrington*, 562 U.S. at 102 ("Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court.").

A criminal defendant is prejudiced by his counsel's errors where he is deprived him of a fair trial.  *Strickland*, 466 U.S. at 678.  Under *Strickland*, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.

When the Circuit Court for Baltimore City addressed the "dual inference" issue on Petitioner's original Petition for Post Conviction Relief,  the court never explicitly analyzed the second (prejudice) prong under *Strickland*; however, the court expressly highlighted "the context [in which the instruction] was given; i.e., pertaining to the consideration of circumstantial evidence only and not the overall burden of persuasion."  Resp't's Ex.4 at 5. In fact, the trial court had also included lengthy instructions on the government's burden to

---

[9]   The state court did not find that the performance of Petitioner's counsel was deficient, reasoning that the instruction had been given due to "the strategic decision of petitioner's lawyers." Resp't Ex.4 at 5.  Specifically, the court noted that Petitioner's counsel requested the instruction and employed it to Petitioner's advantage in closing arguments.  *Id.*

prove Petitioner's guilt beyond a reasonable doubt.   Resp't's Ex.24 at 177-81, 187.

Moreover, during closing arguments, Petitioner's counsel emphasized the government's

burden of proof and noted that Petitioner had no obligation to present evidence in his

defense.   Resp't Ex.25 at 15, 54-57.   These additional instructions are all the more significant

because, when addressing matters of erroneous jury instructions, this Court must consider

the instructions as a whole and within the context of the overall record of the case.   *See*

*Estelle*, 502 U.S. at 72.   Because the court properly instructed the jury on the matters of the

"beyond a reasonable doubt" burden of proof and the presumption of innocence, the state

post-conviction court could have concluded that there was no reasonable probability that the

jury was misled or that the result of the trial would have been different if not for counsel's

alleged error.   *See Miller v. Phillip*, 813 F. Supp. 2d 470, 484 (S.D.N.Y. 2011) (finding that

counsel's failure to object to a similar "two inference" instruction did not merit relief under §

2254 for ineffective assistance of counsel where the trial court had repeatedly reminded the

jury of the "beyond a reasonable doubt" standard); *Floyd v. Grace*, Civ. A. No. 06-2324, 2006

WL 6553085, at *8 (E.D. Pa. Dec. 13, 2006) (same);[10] *cf. Estelle*, 502 U.S. at 75 (taking note of

other limiting instructions in jury charge in case where the United States Supreme Court

refused to find a denial of due process despite the use of a jury instruction that was deemed

contrary to state law).   Indeed, Petitioner's noticeable failure to articulate precisely how

counsel's alleged errors prejudiced him in his papers buttresses this conclusion.   *See, e.g.,*

Pet'r's Mem. Supp. Pet. at 53, ECF No. 87 (baldly asserting that, "[b]ecause the state's case

---

[10]   In order to streamline the citation, the Court has omitted the subsequent history of *Floyd v. Grace*.  The decision, a report and recommendation by United States Magistrate Judge Carol Sandra More Wells, was supplemented, *see* 2010 WL 1490598 (E.D. Pa. Mar. 9, 2010), and then adopted by the district court, *see* 2010 WL 1462368 (E.D. Pa. Apr. 7, 2010).

against Mr. Nicolas was scant and circumstantial, there is a reasonable probability that it affected the outcome of the trial"). In light of the record in this case, the state court could have reasonably concluded that Petitioner failed to demonstrate sufficient prejudice to maintain a claim of ineffective assistance of counsel;[11] therefore, *Harrington* mandates that this Court deny habeas corpus relief under § 2254 with respect to the "dual inference" jury instruction.[12]

c) INEFFECTIVE ASSISTANCE – GUNSHOT RESIDUE

Petitioner asserts that the admission of evidence that he had gunshot residue (GSR) on his left hand undermined the fundamental fairness of his trial. Petitioner has not identified any clearly established federal right or provision of federal law in connection to this claim, nor

---

[11]   The same factors leading to this conclusion on ineffective assistance also provide a plausible basis for the state court to have concluded that the inclusion of the instruction did not violate Petitioner's due process rights.

[12]   As noted above, review under § 2254 involves significant deference to the state court's decision, and this Court is not permitted to independently review the record to determine whether Petitioner's counsel was deficient. Indeed, this Court finds counsel's request for and/or acquiescence to the instruction given in this case to be very troubling, particularly in light of the Court of Appeals of Maryland's clear holding in *Denson*. Notably, while the state post-conviction court mentioned *Denson*, it only cited the case for the principle that a dual inference instruction, when given, "must accurately state it." Resp't Ex.4 at 4. However, the court never assessed whether the trial court had, in fact, accurately stated the dual inference instruction. In *Denson*, the Court of Appeals of Maryland found the trial court had erred where its instruction suggested that "two or more inferences of equal weight" mandated a not-guilty verdict. 628 A.2d at 184. Likewise, in this case, the trial court instructed the jury that "if you find that the evidence is equally consistent with innocence, as well as guilt, then you must find the defendant innocent." Clearly, both instructions imply that a not-guilty verdict requires, at a minimum, evidence leading to inferences of *equal* weight.

While the above analysis suggests that the post-conviction court misapplied Maryland law, such error is of course insufficient under *Estelle* and *Harrington* to warrant relief under § 2254. Moreover, there is no clearly established rule originating from the United States Supreme Court indicating that such "dual inference" instructions are impermissible as a matter of law. *See Miller*, 813 F. Supp. 2d at 483. The state court's findings with respect to the ineffective assistance issue constituted a reasonable justification for denying relief, and this fact must, unfortunately, put an end to this Court's inquiry on this particular issue.

has this Court's investigation revealed any such right or provision warranting the requested relief.  Accordingly, Petitioner's gunshot residue claim fails to qualify for relief under § 2254. *See* 28 U.S.C. § 2254(a).

   d) Brady v. Maryland Issue

   Nicolas contends that two witnesses—Richard Benson and Jennifer McKinsey— were interviewed by police during the investigation of his case and that those witnesses indicated that they had heard a loud noise (similar to a gunshot or a car back-firing) in the general vicinity where Aja's body was found between 9:45 and 10:00 p.m.[13]  Nicolas argues

---

[13]   The state court summarized the statements in its March 29, 2013 memorandum opinion as follows:

> On July 27, 1996, Detectives Don Gordon, Michael Glenn, and Darryl Massey prepared a summary of an interview with "Possible witness, Mrs. Jennifer McKinsey." The summary states in pertinent part,
>
> > She advised that she was going to her vehicle and observed a small vehicle at the bottom of the hill. As she was entering her vehicle she hers [sic] a loud popping sound like a gun shot.  Mrs. McKinsey advises as she was exiting the parking lot the car sped off.
>
> (Motion to Reopen at Ex. 14(D)). Mr. Benson's statements come from a summary report and a taped interview on January 23, 1997. The pertinent portion of the interview reads,
>
> > Mr. Benson: I noticed that there was this car sitting down by the, by where the trucks park down there...I'm in a parking lot...
> > So I was just kind of looking at him because it was kinda suspicious. Not to be prejudicial or anything, but it was a black guy sitting in the car... I saw the dome light come on and it looked like, I don't know if he was reading something ... I was just standing at my door with the key in the door, in the keyhole, and then opened my door and kind like cracked my door but didn't open it ... And I was still kinda just watching over the hood of my truck which sits really high, so there's only one thing to see coming over the hood of the truck is my head, you know? And I saw this flash of light and heard a bang. But I didn't know what it was. I mean I didn't know if it was, I don't know, it was just like when I turned my head and looked at it, I guess, is when it was really happening.
> > Det. Gordon: Okay, so you saw a flash of light and a bang, you heard a loud noise?

that these statements were improperly withheld in violation of his due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963).

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment." *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  "The *Brady* rule is based on the requirement of due process.   Its purpose is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur."  *United States v. Bagley*, 473 U.S. 667, 675 (1985).   The *Brady* requirement extends beyond just the prosecutor; "the knowledge of some who are part of the investigative team is imputed to prosecutors regardless of the prosecutors' actual awareness."  *United States v. Robinson*, 627 F.3d 941, 951 (4th Cir. 2010).[14]

In order to prevail on a *Brady* claim, it must be established that the evidence at issue is both favorable to the defense and that the unavailability of the evidence calls into question

---

> Mr. Benson: Right. I thought it was, I thought the light came from inside the car but didn't know, and I didn't know if maybe it was his dome light or what it was, I really couldn't tell.
> Det. Gordon: Okay and the loud bangs sounded like what kind of noise to you, could you tell?
> Mr. Benson: It sounded like a car was blowing up, is what is sounded like... It looked like there was some confusion in the car really because, you know, the guy was like looking around and I guess trying, you see, I thought maybe he was lost and was trying to figure out where he was, I didn't know. I thought his car backfired or something. He was looking around and then he pulled off and went up the street.
>
> (Motion to Reopen at Ex. 14(F)). Both statements establish that the witnesses heard a loud bang. Ms. McKinsey describes the bang as like a gunshot. Mr. Benson describes it as a car blowing up or backfiring.

Mar. 29, 2013 Mem. Op. at 7-8 (Geller, J.).

---

[14]   The court noted in *Robinson*, however, that the scope of imputation does have some limits.  In this case, the State does not dispute these legal principles, nor has it argued that the circumstances of this case warrant a conclusion that such knowledge such not be imputed.

23

the result of the trial. *Bagley*, 473 U.S. at 678.   The Supreme Court has made it clear that there is no distinction between exculpatory evidence and impeachment evidence in the context of the *Brady* analysis. *See Giglio v. United States*, 405 U.S. 150, 154 (1972).   There is no requirement that the guilty finding must be overturned unless suppression of the impeachment evidence so limited the defense's ability to cross-examine an accusing witness that "its suppression undermines confidence in the outcome of the trial." *Bagley*, 473 U.S. at 678.

Moreover, "[e]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682.   Thus, under the Supreme Court's jurisprudence, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). "[T]he materiality inquiry is a context-specific determination." *Spicer v. Roxbury Correctional Institute*, 194 F.3d 547, 560 (4th Cir. 1999).   The reviewing court must "evaluate the whole case, taking into account the effect that the suppressed evidence, had it been disclosed, would have had on the evidence considered at trial." *United States v. Ellis*, 121 F.3d 908, 918 (4th Cir. 1997).

In this case, Petitioner challenges the state courts' conclusions with respect to both favorability and materiality.[15]   For the reasons that follow, this Court finds that the

---

[15]   The statements of Benson and McKinsey were first before the Circuit Court for Baltimore City on Petitioner's First Motion to Reopen, which was decided by Judge Berger.  When Petitioner's case was before Judge Geller, Petitioner re-asserted that the Benson and McKinsey statements were *Brady* materials, but Petitioner also presented a number of new documents—including the prosecutor's

unavailability at trial of the evidence, which was favorable to Nicolas, calls into question the result of that trial, undermines confidence in its outcome, and did not result in a jury verdict worthy of confidence.

### 1. Favorability

The issue of the statements' favorability was raised before the Circuit Court of Baltimore City on two separate occasions.  On Petitioner's first motion to reopen, Judge Berger ruled that the Benson and McKinsey statements were not favorable.  Specifically, Judge Berger found that "these witnesses would have given testimony that, at best, conflicted with the theory of the case advanced by the Petitioner," and he further noted that "arguably the statements by the witnesses were more consistent with the State's theory of the case than the defense."[16]  Aug. 18, 2010 Mem. Op. at 9 (Berger, J.).

---

post-trial letters to Dr. Chute and Officer Hannah—that were uncovered during the discovery period in this Court.  *See* Pet'r's Mot. to Reopen Post-Conviction Proceeding at 14-17, Pet'r's Ex. OO, ECF No. 145-4.  As is clear from his opinion, Judge Geller considered the effect of Benson and McKinsey's statements to be an issue that had "been considered on its merits and denied."  Mar. 29, 2013 Mem. Op. at 9 (Geller, J.).

[16]    The relevant section of Judge Berger's memorandum opinion reads as follows:

      The Petitioner asserts that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963) by failing to disclose to trial counsel that the police had interviewed two witnesses who heard a loud bang around the time and near the location that the Petitioner claimed his daughter was shot.  The Petitioner claims he wasn't provided with the police interview transcripts of theses witnesses until a Public Information Act request was filed years later.  He claims that while the prosecutors may not have known about these witnesses, the police did, and under *Brady*, police knowledge is imputed to the State.  Petitioner argues that this evidence is exculpatory and material.  The Petitioner claims that two witnesses testifying that they heard loud bangs at the same time and in the same place where the Petitioner claimed the victim was shot would have corroborated the Petitioner's testimony, and would have led to an acquittal by the jury.

      The State contends that the statements given by the two witnesses were not exculpatory in any way.  The State contends that the witnesses identified a factual scenario arguably consistent with the State's theory that the Petitioner shot his daughter.  The State claims these witnesses identified only one truck in the area—not

Aug. 18, 2010 Mem. Op. at 9 (Berger, J.).   Petitioner's subsequent application for leave to

appeal filed with the Court of Special Appeals of Maryland was denied without any

explanation on July 15, 2011.  When Petitioner returned to the state courts to file his Second

Motion to Reopen Post-Conviction Proceedings, Judge Geller stated that he "[saw] the

favorability analysis of the *Brady* claim as unchanged since it was reviewed by the Honorable

---

the second vehicle containing the shooter as alleged by the Petitioner—and that the witnesses identified the driver of the vehicle as black, not white as the Petitioner claimed the shooter to be.

The seminal case of *Brady v. Maryland*, 373 U.S. 83, 87 (1963), held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  The Court of Appeals stated in *Harris v. State*, 407 Md. 503, 521 (2009) that:

in order to establish a *Brady* violation, the petitioner must show that (1) the prosecutor suppressed or withheld evidence that would have been favorable to the defense because it (i) was exculpatory, (ii) provided a basis for mitigation of sentence, or (iii) provided a basis for impeaching a State witness, and (2) the suppressed evidence was material.

Furthermore, the Supreme Court has stated that there must be a "reasonable probability" that disclosure of the suppressed evidence would have produced a different result at trial.  *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

The Petitioner is correct that the knowledge of the police is imputed to the State.  Nevertheless, the Petitioner cannot prove that the State withheld exculpatory, mitigation, or impeachment evidence that resulted in prejudice to the Petitioner. Clearly, if the Petitioner knew of the witnesses in question, he could have called them to testify at trial.  However, based upon the facts presented by the Petitioner, these witnesses would have given testimony that, at best, conflicted with the theory of the case advanced by the Petitioner.  Indeed, arguably the statements by the witnesses were more consistent with the State's theory of the case than the defense. As such, the Petitioner has not presented facts that if proven at a subsequent hearing would established [sic] that the evidence was exculpatory, or that show a reasonable probability that the evidence would have produced a different result at trial.

Accordingly, this Court finds that it would not be in the interests of justice to reopen Petitioner's closed post conviction proceeding to hear argument on this issue.
Aug. 18, 2010 Mem. Op. at 7-9 (Berger, J.).

Stuart R. Berger."[17]  Mar. 29, 2013 Mem. Op. at 9 (Geller, J.), Pet'r's Ex. UU, ECF No. 145-

8.  The Court of Special Appeals again affirmed the Circuit Court.[18]

---

[17] The section of Judge Geller's memorandum opinion addressing the favorability issue read as follows:

> The confounding nature of this matter's current posture stems from positions taken by both the State and Petitioner in the U.S. District Court that directly contradict their arguments in this Court. The Defense argued emphatically in federal court that state court remedies had been exhausted because the materials disclosed in the federal court discovery process were not new, critical or significant. By contrast, the State pressed to return to state court, arguing that the newly-disclosed materials mandated a return for exhaustion of state remedies.
>
> Now, upon their return to this Court, the parties have each made a 180 degree turn, with the State arguing that the newly-disclosed materials are irrelevant and the Petitioner arguing that the newly-disclosed materials have completely changed the landscape that existed when this matter was addressed by the Honorable Stuart R. Berger in August 2010.
>
> Petitioner emphasized in its brief, and again in oral argument, that The Honorable Richard D. Bennett of the U.S. District Court has opined that the facts of this case present a "clear" *Brady* violation. This Court notes that, with all respect to The Honorable Judge Bennett, he examined this matter in the context of an exhaustion hearing — not a hearing on the merits of the *Brady* claim, and without the benefit of a substantive response on the merits from the State or a complete analysis of how the alleged *Brady* evidence fits within the entirety of evidence produced at trial.
>
> Having considered the pleadings and arguments of counsel, as well as the entire record of this case, this Court sees the favorability analysis of the *Brady* claim as unchanged since it was reviewed by the Honorable Stuart R. Berger. The newly-disclosed materials from the federal action shed light merely on the fact that the Baltimore City Police were engaged in a thorough investigation. Judge Berger considered the alleged *Brady* violation in the context of a Motion to Reopen Postconviction, and his August 18, 2010 Memorandum Opinion set forth a favorability analysis of the witness statements in the context of the trial evidence as a whole. Thus, the *Brady* issue has been considered on its merits and denied. The appellate court denied Defendant's Application for Leave to Appeal. (Motion to Reopen at Ex. 13).
>
> Upon consideration of the additional materials produced in federal court, this Court sees nothing to change Judge Berger's prior ruling that "Petitioner has not presented facts that if proven at a subsequent hearing would [have] established that the evidence was exculpatory, or that show a reasonable probability that the evidence would have produced a different result at trial." August 18, 2010 Memorandum Opinion at 9. Furthermore, this Court agrees with and adopts the analysis and conclusions as set forth in Judge Berger's August 18, 2010 Memorandum Opinion.

Mar. 29, 2013 Mem. Op. at 8-10 (Geller, J.), Pet'r's Ex. UU, ECF No. 145-8.

In this proceeding, Petitioner attacks the state courts' conclusions on favorability, arguing that the state courts misapplied settled federal law by failing to consider the impeachment value of the suppressed statements.  Petitioner also takes issue with the state courts' conclusion that the statements were not helpful to him and were more consistent with the State's theory of the case.  In opposition, the State argues that the state courts reasonably concluded that Petitioner failed to establish that the witness statements were favorable to him.  In particular, the State contends that the evidence does not qualify as exculpatory evidence because "(1) the statements of Benson and McKinsey do not in anyway [sic] tend to exonerate Petitioner; (2) there was no proof presented in prior state or federal court proceedings that the defense actually would have called either Benson or McKinsey to testify in the case had it known of the Benson and McKinsey statements; and (3) there was no proof below that, even if called to testify, Benson and McKinsey would have testified favorably to Petitioner, i.e., in a manner consistent with Petitioner's defense."  Resp.'s Suppl. Ans. at 25, ECF No. 146.  The State also argues that the statements have no value as impeachment evidence; in particular, without any further explanation, the State dismisses the notion that the statements could have been used to impeach Dr. Chute's lividity and time of death testimony, stating that Petitioner's assertion "has never been substantiated."  *Id.* at 26.  Finally, the State characterizes the Petitioner's position on the favorability of the statements

---

[18]   After reviewing the prosecutors' letters to Officer Fred Hannah (the first responding officer on the scene) and to Dr. Chute, the Court of Special Appeals noted:

> All that these letters show is that the prosecuting attorneys believed that the evidence of the time of death was crucial to the State's case.  The letters do not, in light of all of the evidence introduced at the trial, render the undisclosed statements material.  Therefore, we hold that the non-disclosure did not amount to a discovery violation or warrant post-conviction relief.

*See* Pet'r's Ex. WW

as "ludicrous," suggesting that "[t]he statement of Benson and McKenzie both describe a specific and discrete set of facts that do not in any way relate to Petitioner's accounting of Aja's murder." *Id.*

After reviewing the parties' submissions and the record in this case, this Court concludes that the state courts' various rulings are based upon an unreasonable determination of the facts in light of the evidence presented in those proceedings. Specifically, the state courts provided no analysis whatsoever to justify their conclusion that the suppressed statements "conflicted with [Petitioner's] theory of the case." Aug. 18, 2010 Mem. Op. at 9 (Berger, J.), Pet'r's Ex. N.; Mar. 29, 2013 Mem. Op. at 10 (Geller, J.), Pet'r's Ex. UU, ECF No. 145-8, (agreeing with and adopting Judge Berger's August 18, 2010 Memorandum Opinion).  As is apparent from the record in this case, the lynchpin for the State's premeditated murder theory was the time of death. At trial, the State theorized that the shooting occurred some hours before Petitioner contacted authorities, while the Petitioner asserted that the shooting occurred around 9:45 p.m.—shortly before Petitioner contacted authorities and the police arrived on the scene.  Evidence suggesting that the fatal shot was fired around 9:45 p.m. would have contradicted the State's theory and supported Petitioner's version of events.  As such, there was absolutely no basis for the state courts to conclude that the suppressed statements conflicted with Petitioner's theory of the case. Accordingly, this Court finds that the state court decision on the favorability of the suppressed statements was based upon an unreasonable determination of the facts in light of the evidence before the state court and, therefore, Petitioner has satisfied his burden under § 2254 with respect to this issue.

## 2. Materiality

Because Judge Berger found that the suppressed statements were not favorable, he never reached the issue of whether the suppressed statements were material.  Although Judge Geller agreed with Judge Berger on the issue of favorability, he also ruled against the Petitioner on the issue of materiality.[19]  Specifically, Judge Geller summarized the evidence against Petitioner and noted that he found it "compelling."  Mar. 29, 2013 Mem. Op. at 21-22 (Geller, J.), Pet'r's Ex. UU, ECF No. 145-8.  Additionally, Judge Geller noted that "much

---

[19]     The full text of Judge Geller's Memorandum Opinion on the issue of materiality reads as follows:

> To be material, there must be a "nondisclosure [that] was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler*, 527 U.S. at 281. The Court considers independent evidence of guilt to determine if the suppressed evidence can actually shake confidence in the verdict. *Id.* at 290-96.

> The independent evidence of guilt upon which the State relies includes: 1) Time of death evidence established through Dr. Chute's lividity testimony and detective testimony that the blood on Aja was dry and her body was cold when they reached the car; 2) Petitioner possessed or previously owned at least three .357 caliber Ruger firearms and his favorite ammunition, later discovered at his home, was the ammunition that killed Aja; 3) the lack of obvious damage to Petitioner's bumper that would have been consistent with the road rage defense; 4) gun residue on Petitioner's hand; 5) Petitioner's inconsistent statements about the race of the perpetrator and whether he exited the car; and 6) the Petitioner's calm demeanor that is inconsistent with a grieving or worried parent. The State also relied on evidence that Aja was sitting in the front seat with her seat belt on and her head could barely be seen from outside the car. Experts testified that it was impossible for Aja to have been shot four inches below the top of her head by someone sitting in the driver's seat of another car, especially since the window next to her was up two inches.

> The Court finds the evidence cited by the State to be compelling. In contrast, the additional material disclosed in the U.S. District Court proceeding merely demonstrates a diligent investigation by the Baltimore City Police Department. Furthermore, much of the other non-disclosed interviews and statements contradict Petitioner's theory of defense or are otherwise damaging to him, and would certainly not rise to the level where they resulted in a verdict that is not worthy of confidence. And, as noted supra, while letters written by the prosecuting attorneys were distasteful, they do not serve to turn non-*Brady* material into *Brady* material because they opine on the importance of particular testimony and evidence. After considering all of this evidence and the record as a whole, this Court finds that the undisclosed evidence is not material and therefore no *Brady* violation occurred.

Mar. 29, 2013 Mem. Op. at 21-22 (Geller, J.), Pet'r's Ex. UU, ECF No. 145-8.

of the other non-disclosed interviews and statements contradict[ed] Petitioner's theory of defense or [we]re otherwise damaging to him," and he rejected the notion that the prosecutors' letters to Officer Hannah and Dr. Chute had any relevance in the materiality analysis. *Id.*

As is apparent from the state court's summary of the prosecution's evidence against Petitioner, the State presented a purely circumstantial case. Noticeably absent from this summary, however, is any consideration of the suppressed statements within the context of Petitioner's defense. *See Monroe v. Angelone*, 323 F.3d 286, 302 (4th Cir. 2003) ("In assessing the issue of materiality, we must evaluate the importance of the Commonwealth's suppression of the Habeas Evidence. To do so, we first assess the Commonwealth's evidence that Monroe committed first-degree murder. We then weigh against this evidence the strength of Monroe's defense. Finally, we consider whether the Habeas Evidence, had it been disclosed and used effectively, is likely to have affected the verdict of first-degree murder."). The improper consideration of only the prosecution's evidence led the state courts to the irrational conclusion that the statements were not material. While a review of the record makes abundantly clear that the crux of the case against Petitioner was the lividity testimony concerning the time of death, the import of that evidence was all the more obvious in this case: there is written acknowledgement by the trial prosecutors in this case that Dr. Chute's lividity testimony was "the whole case." *See* Pet'r's Exs. KK & LL. For the state courts to have suggested otherwise is simply unreasonable and inaccurate. *Cf. Wolfe v. Clarke*, 691 F.3d 410, 424 (4th Cir. 2012) (taking note of state prosecutor's concession at cooperating witness' sentencing that the habeas petitioner would "probably not have been

prosecuted" but for the cooperating witness' testimony in the context of the materiality analysis under *Brady*).

Had the state court actually weighed the state's case against the Petitioner's defense or considered the suppressed statements within the proper context of both the State and defense evidence, it is clear that no fair-minded jurist could have concluded that the suppressed statements were not material.  In particular, Petitioner offered his own evidence that undermined the evidence used by the prosecution and considered by the state courts. At trial, Petitioner's gunshot residue expert testified that the gunshot residue on Petitioner's hand could have come from a secondary transfer, and he expressly disagreed with the State's expert who had opined that the gunshot residue on Petitioner's hand was "most probably" due to firing a weapon.  *See* Pet'r's Suppl. Mem. Supp. Pet. at 16, ECF No. 116.  Plaintiff also offered his own expert testimony regarding blood spatter and the angle of the shooting.  *See* Pet'r's Mem. Supp. Pet. at 2, 16 n.5, ECF No. 87.  Another expert testified that Petitioner's vehicle had been involved in some incident involving contact to or collision with the rear of his vehicle.  *See id.* at 16 n.5.  Moreover, on cross-examination, Petitioner brought out the fact that the alleged inconsistency in Petitioner's statements concerning the race of the shooter was not present in the witness' original statement to police.  *See id.* at 12.  Petitioner also offered testimony that his calm demeanor at the scene was attributable to the fact that, after years of corrective therapy, Petitioner had learned to speak slowly and unemotionally in order to control a severe stutter.

In sum, the State put on a circumstantial case in which much of their evidence was disputed.  This evidence on the critical point of the State's theory—the time of Aja's

shooting—was likely to have an effect on the outcome of Petitioner's trial, and its suppression has resulted in a verdict unworthy of any confidence.[20] *Cf. Wolfe*, 691 F.3d at 424 (noting that materiality of impeachment information was "manifest" where the witness' testimony provided the only evidence for one of the elements of the crime); *Aguilar v. Woodford*, 725 F.3d 970 (9th Cir. 2013) (habeas petition granted where state officials suppressed fact that canine had made mistaken scent identifications in previous cases in case where the prosecutors had emphasized the scent identification as definitive proof that petitioner was shooter and the scent identification provided the only corroborating evidence for "shaky eyewitness identifications"); *Gantt v. Roe*, 389 F.3d 908, 913-16 (9th Cir. 2004) (granting habeas relief in case where state officials failed to disclose evidence indicating matchbook with phone number written inside that had been discovered on petitioner's person upon his arrest was not connected to murder victim despite prosecutor's use of the matchbook as circumstantial evidence that petitioner was the murderer).   Accordingly, this Court finds the state court's decision to be an unreasonable one and will grant the Petitioner's petition for writ of habeas corpus on the *Brady* issue.  While recognizing that the writ affords an extraordinary remedy, this Court finds that the requested relief is necessary in light of the state court's repeated refusal to vindicate Petitioner's due process rights under *Brady v. Maryland*.[21]

---

[20]   The state courts' conclusion that the evidence merely demonstrates a "thorough investigation" by police actually favors Petitioner.  The fact that the officers followed up with Benson *several months after his initial interview* indicates that the State recognized the evidence as potentially significant and felt the need to conduct a follow-up.

[21]   The procedural history of this case in the state system is noteworthy in this respect.  Petitioner's *Brady* claim was first raised on his first motion to reopen post-conviction proceedings.  Judge Berger denied that motion without hearing and the Court of Special Appeals of Maryland summarily denied

## CONCLUSION

For the foregoing reasons, Petitioner Richard A. Nicolas's Petition for Writ of Habeas Corpus (ECF No. 1) along with his Amendment to, and Second Supplemental Memorandum of Law in Support of, Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 is GRANTED IN PART AND DENIED IN PART.   Specifically, the Petition is granted with respect to Petitioner's *Brady* claim, and it is denied with respect to all other claims.   Accordingly, Petitioner's conviction and sentence are VACATED, and the case is remanded to the Circuit Court of Baltimore City for a new trial.   However, this Court's Judgment will be STAYED FOR THIRTY (30) DAYS to allow for an appeal or, absent an appeal, a decision by the Circuit Court for Baltimore City concerning the Petitioner's continued confinement.

A separate Order follows.


Dated:        March 30, 2015

                                        _____/s/_____
                                        Richard D. Bennett
                                        United States District Judge

---

his application for leave to appeal.  Thus, Petitioner's first hearing on the *Brady* issue occurred after the state courts definitively denied that the Benson and McKinsey statements constituted *Brady* material.